UNITED STATES DISTRICT COURT

DISTRICT OF VERMONT

| | |
|---|---|
| OTTER CREEK SOLAR LLC,<br><br>Plaintiff,<br><br>v.<br><br>GREEN MOUNTAIN POWER CORPORATION, and VEPP, INC.,<br><br>Defendants. | Case No. 1:16-cv-13<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES FOR VIOLATIONS OF THE FEDERAL POWER ACT AND THE PUBLIC UTILITY REGULATORY POLICIES ACT |

## LEGAL BACKGROUND

1. In 1978, Congress enacted the Public Utility Regulatory Policies Act ("PURPA") to "accelerate the development of renewable and inexhaustible energy sources and convert the national economy to alternative fuel resources in order to protect this country from the problems that would otherwise occur." H.R. Rep. No. 95-496(IV), at 14 (1977), *reprinted in* 1978 U.S.C.C.A.N. 8454, 8466. Toward that end, Congress established a framework designed to make it easier for certain small renewable generators (known as "qualifying small power production facilit[ies]" under the statute and "Qualifying Facilities" or QFs under FERC's regulations, *see* 16 U.S.C. § 796(17)(C); 18 C.F.R. § 292.203) to sell their electricity to utilities, and to provide economic incentives for parties to develop such generation facilities. As relevant here, the federal regulatory framework has three key attributes.

2. *First*, under PURPA, electric utilities *must* purchase *any* electricity produced by QFs. Congress directed that "[FERC] shall prescribe ... such rules as it determines necessary to encourage ... small power production ... which rules *require* electric utilities to offer to – ... (2) *purchase electric energy from [qualifying]*

1

COMPLAINT

*facilities.*" 16 U.S.C. § 824a-3(a) (emphasis added). FERC subsequently adopted rules providing that "*[e]ach electric utility shall purchase . . . any energy and capacity* which is made available from a qualifying facility . . . [d]irectly to the electric utility." 18 C.F.R. § 292.303(a)(1) (emphasis added). This regulation creates a "legally enforceable obligation" on the utility to purchase the electricity generated by a QF, typically through a contract. *See* 18 C.F.R. § 292.304(d)(2); *Power Res. Grp., Inc. v. Pub. Util. Comm'n of Tex.*, 422 F.3d 231, 233 (5th Cir. 2005); *JD Wind 1 LLC*, 130 FERC ¶ 61,127, para. 7 (2010) (stating that "section 292.30(d) and its requirement that a QF can sell and a utility must purchase pursuant to a legally enforceable obligation were specifically adopted to prevent utilities from circumventing the requirement of PURPA that utilities purchase energy and capacity from QFs….[A] QF has the option to commit itself to sell all or part of its electric output to an electric utility through a written contract or a non-contractual, but still legally enforceable, obligation…[A] QF, by committing itself to sell to an electric utility, also commits the electric utility to buy from the QF…[T]hese commitments result either in contracts or in non-contractual, but binding legally enforceable obligations.")

3.  *Second*, Congress specified that the rate that utilities are required to pay QFs shall not "exceed[] the incremental cost to the electric utility of alternative electric energy." 16 U.S.C. § 824a-3(b). FERC subsequently adopted rules providing that, for facilities constructed after PURPA's passage, the required rate for purchases must "*equal[] the avoided costs*" of the utility. 18 C.F.R. § 292.304(b)(2) (emphasis added); *see also Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 417 (1983) (upholding FERC regulation requiring utilities to purchase electricity from qualifying facilities at the "maximum rate authorized by PURPA," namely a utility's full avoided cost). As FERC explained in promulgating its rules, "'avoided costs' [are] the costs to an electric utility of energy or capacity or both which, but for the purchase from a qualifying facility, the

2

utility would generate or construct itself or purchase from another source." PURPA Rulemaking, 45 Fed. Reg. at 12,216. Recognizing that requiring a utility to pay its full avoided costs "would not directly provide any rate savings to electric utility consumers," FERC nevertheless "deemed it more important ... [to] 'provide a significant incentive for a higher growth rate'" of QF power production, because "the nation as a whole will benefit from the decreased reliance on scarce fossil fuels ... and the more efficient use of energy." *Am. Paper Inst.*, 461 U.S. at 415 (quoting 45 Fed. Reg. at 12,222).

4. *Third*, FERC adopted a rule allowing QFs to choose among several different ways of calculating a utility's avoided costs. *See* 18 C.F.R. § 292.304(d). As relevant here, when a QF is selling to a utility pursuant to a legally enforceable obligation (such as a contract) over a specified term, FERC provided that "the rates for such purchases shall, *at the option of the qualifying facility* exercised prior to the beginning of the specified term, be based on *either*: (i) The avoided costs calculated at the time of delivery; or (ii) The avoided costs calculated at the time the obligation is incurred." 18 C.F.R. § 292.304(d)(2) (emphasis added).

5. In other words, a QF can elect to have the utility's avoided costs (and thus its rate) determined on an ongoing basis, calculated when electricity is physically delivered to the utility; *or* the QF can instead elect to have the utility's avoided costs calculated when the contract is entered, so that it can "establish a fixed contract price for its energy and capacity at the outset of its obligation." PURPA Rulemaking, 45 Fed. Reg. at 12,224. FERC understood that "in order to be able to evaluate the financial feasibility of a [QF], an investor needs to be able to estimate, with reasonable certainty, the expected return on a potential investment before construction of a facility." *Id.* at 12,218. Ensuring that a QF can elect to have "avoided costs calculated at the time the obligation is incurred," 18 C.F.R. § 292.304(d)(2)(ii), provides this reasonable certainty. FERC recognized that the utility's avoided costs calculated at the time the obligation is incurred may turn out

3

to be quite different than the utility's avoided costs at the time the power is actually delivered. PURPA Rulemaking, 45 Fed. Reg. at 12,224. But FERC believed that "in the long run, 'overestimations' and 'underestimations' of avoided costs will balance out," and it emphasized "the need for certainty with regard to return on investment in new technologies." *Id.; see also JD Wind*, 130 FERC ¶ 61,127, at para. 23 ("[FERC] has ... consistently affirmed the right of QFs to long-term avoided cost contracts ... with rates determined at the time the obligation is incurred, even if the avoided costs at the time of delivery ultimately differ from those calculated at the time the obligation is originally incurred.")

6. PURPA directed state regulatory agencies, such as the Vermont Public Service Board ("PSB"), to adopt rules that comply with and implement FERC's regulations. *See* 16 U.S.C. § 824a-3(f)(1); *see also* PURPA Rulemaking, 45 Fed. Reg. at 12,216 ("each State regulatory authority ... must implement these rules."). And, because states' *only* authority to regulate wholesale electricity sales is derived from PURPA, *see* 16 U.S.C. § 824(b) (giving FERC exclusive jurisdiction over wholesale sales of electricity in interstate commerce); *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966 (1986),[1] any state rule that conflicts with PURPA is necessarily preempted.

7. Under its PURPA authority, the PSB has adopted PSB Rule 4.100 related to "implement[] the provisions of 30 V.S.A. Section 209(a)(8) and 16 U.S.C. Section 824a-3." The PSB has also adopted rules related to the Vermont Sustainably Priced Energy Enterprise Development ("SPEED") Program, *see* 30 V.S.A. §§ 8005a *et seq.* The Board maintains two ongoing rulemaking dockets, Dockets 7873 and 7874, for purposes of the SPEED program. Defendant VEPP, Inc.

---

[1] Electricity in interstate commerce includes "in-state" electricity that is commingled with electricity transmitted out of state. *See FPC v. Fla. Power & Light Co.*, 404 U.S. 453, 462-63 (1972). Thus, a wholesale sale of electricity is under federal jurisdiction so long as the electricity is transmitted on lines interconnected with an interstate grid, as will be the case here.

("VEPPI") has been designated by the PSB as the "Purchasing Agent" under PSB Rule 4.100 and the "Standard Offer Facilitator" pursuant to 30 V.S.A § 8005a(a).

8.  Green Mountain Power Corporation ("GMP") is an electric utility under PURPA, VEPP, Inc. ("VEPPI") is not. *See*, 16 U.S.C. § 2602(4). As a result under 16 U.S.C. § 824a-3(a) and 18 C.F.R. §§ 292.303 and 292.304, in this case it is GMP, the utility with which the Plaintiff's projects will interconnect, that is obligated to purchase energy and capacity at an "avoided cost" rate. Indeed the FERC's regulations provide only two circumstances (both of which are not applicable here) in which the interconnecting utility can be relieved of its mandatory purchase obligation. The first is in 16 U.S.C. § 824a-3(m)(1),[2] and the second circumstance is described in 18 C.F.R. § 292.303(d) and requires the consent of the QF.[3]

9.  While States have some flexibility in devising programs to implement the federal statute and regulations, they still must act within the boundaries of federal law. Thus, States may not exempt their utilities from the obligation to purchase renewable power under Section 210 of PURPA. Nor may States refuse to offer renewable generators the ability to choose between the two pricing methodologies set forth in the federal regulations. Any such State action would be doubly preempted: it would not only conflict with PURPA, but would also fall

---

[2] A utility has no purchase obligation if FERC has made the findings described in 16 U.S.C. § 824a-3(m)(1). However, FERC has not made those findings regarding QFs of less than 20 megawatts ("MWs") in Vermont. If it had, then the PSB would not have any authority to create the Vermont SPEED program.

[3] 18 C.F.R. § 292.303(d), which provides in relevant part:

> *If a qualifying facility agrees,* an electric utility which would otherwise be obligated to purchase energy or capacity from such qualifying facility may transmit the energy or capacity to any other electric utility. Any electric utility to which such energy or capacity is transmitted shall purchase such energy or capacity under this subpart as if the qualifying facility were supplying energy or capacity directly to such electric utility.

(emphasis added).

within the field of wholesale electricity rate-setting, which, except for PURPA, Congress has reserved exclusively for FERC.

10. Similarly, States may not discriminate against QFs, or among similarly situated QFs. 16 U.S.C. §§824d, 824e. Thus a determination by the PSB of what costs a utility would avoid by purchasing from a renewable energy generator must be applied on a non-discriminatory basis for the benefit of all similarly situated renewable energy QF generators.

11. The FERC's regulations issued under PURPA Section 210(a) are enforceable under the Federal Power Act ("FPA"). *See*, 16 U.S.C. § 824a-3(h)(1).

12. This complaint seeks declaratory and injunctive relief and damages against GMP for violating the Plaintiff's rights under the FPA and PURPA by refusing to agree to purchase energy and capacity from a group of Plaintiff's QF solar projects, which are listed in Schedule 1 hereto, at the long-term rate required under Section 210 of PURPA (*see*, 18 C.F.R. § 292.304(d)(2)(ii)).

13. For its part, GMP claims that it is VEPPI, and not GMP, that has the obligation to purchase energy and capacity from Plaintiff's solar projects under PURPA.  GMP's position is simply that the PSB has the authority to alter obligations imposed directly on GMP by Federal law, which it claims the PSB has done through PSB Rule 4.100, which appoints VEPPI as the purchasing agent for purposes of that rule. As a result, VEPPI is an indispensable party under Fed. R. Civ. P. 19, and this complaint seeks relief against VEPPI in the alternative, in the event that the Court agrees with GMP.

## PARTIES

14. Plaintiff Otter Creek Solar LLC ("Plaintiff" or "Otter Creek") is the owner and developer of the Qualifying Facilities in Vermont listed in Schedule 1 hereto. *See*, Section 3(17)(C) of the FPA, 16 U.S.C. §796(17)(C). Plaintiff is a "qualifying small power producer" within the meaning of 16 U.S.C. §796(17)(D).

15. Defendant Green Mountain Power Corporation is a Vermont electric company with a principal place of business in Colchester, Vermont.

16. Defendant VEPP, Inc. is a Vermont corporation and the entity designated by the PSB as the "Purchasing Agent" under PSB Rule 4.100 and the "Standard Offer Facilitator" under the SPEED program.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action brings claims arising under federal law.

18. This Court has subject matter jurisdiction over this action pursuant to 16 U.S.C. § 825p because it brings claim under the FPA.

19. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 on the grounds of diversity of citizenship as the amount in controversy exceeds $75,000, and the Plaintiff is a citizen of Delaware and New York and Defendants are citizens of Vermont.

20. This Court is empowered to grant declaratory relief by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

21. This Court is empowered to grant preliminary and permanent injunctive relief by, *inter alia*, 28 U.S.C § 2202; and Rule 65 of the Federal Rules of Civil Procedure.

22. This Court has personal jurisdiction over Defendants as they conduct their respective businesses, and are headquartered, in the District of Vermont.

23. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events giving rise to this action occurred in the District of Vermont.

## FACTS APPLICABLE TO ALL COUNTS

24. Plaintiff first started discussions with GMP regarding contracts under PURPA in December 2013. Plaintiff made every effort to act in good faith to try to

negotiate an agreement that complies with not only the provisions of PURPA but the spirit as well. To date those efforts with GMP have proven unsuccessful.

25. On January 15, 2016, Plaintiff made its final offer to GMP by sending to GMP a complete and executed power purchase agreement for each QF, which power purchase agreements met all the requirements for a legally enforceable obligation. That offer is attached as Attachment A hereto.

26. In order to be as accommodating as possible, the Plaintiff allowed GMP to select among three options for the long-run avoided cost rate to be paid to Plaintiff's QFs.

27. The first option was a fixed level rate of 15.5 cents per kilo-watt-hour ("KWh"). That rate was determined by the PSB in Dockets 7873/7874 to be the long-term 25-year avoided cost rate for similarly situated solar projects. If GMP selected that rate all environmental attributes related to the electricity generated by the projects would also be transferred to GMP because that was the basis upon which the PSB determined the 15.5-cent rate.

28. The second option was a fixed level rate of 12.8 cents per KWh. That rate was based upon the sworn testimony of GMP in PSB Dockets 8564 and 8580, which dockets are still in process, where GMP's Director of Power Supply, Douglas Smith, testified that the 25-year long-term avoided costs for similarly situated solar projects are approximately 16.4 cents per KWh (including environmental attributes), and between 12.8-12.9 cents per KWh (not including environmental attributes). If GMP selected that rate no environmental attributes related to the electricity generated would be transferred to GMP because that was the basis upon which GMP based its 12.8-12.9-cents per KWh calculation.

29. The third option was based upon the year-by-year projected avoided costs. Thus the rates would generally increase as time passed. Those rates were based upon the determination of an expert energy consulting firm, and on a

levelized basis were consistent with both the PSB's determination in Dockets 7873/7874 and GMP's sworn testimony in PSB Dockets 8564 and 8580.

30. Plaintiff also offered to allow VEPPI be the obligor and purchaser as an alternative to GMP.

31. Neither GMP nor VEPPI have returned executed copies of the power purchase agreements to Plaintiff, and have continued their failure to acknowledge the obligations under federal law.

32. On May 1, 2013, Otter Creek filed a petition for enforcement against the PSB with the FERC. On June 27, 2013, FERC issued a notice of its intent not to act. *See, Otter Creek Solar LLC*, 143 FERC ¶ 61,282 (2013).

## CLAIM FOR RELIEF

### COUNT I

### VIOLATION OF THE FEDERAL POWER ACT AND PURPA BY GMP

33. Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 32 as though fully set forth herein.

34. GMP has an obligation to purchase any and all energy and capacity offered to it by Plaintiff's QFs. Plaintiff has offered to sell to GMP all energy and capacity from its QFs listed on Schedule 1 for a specified committed term of 25 years. Through its offer to GMP, Plaintiff has committed itself to sell to GMP for the 25-year term. GMP has refused and continues to refuse to purchase such energy and capacity at the long-term forecasted rate offered by Plaintiff and required by federal law.

35. GMP's refusal to purchase the energy and capacity at the long-term forecasted rate required by federal law from Plaintiff's QFs violates its obligations imposed under federal law. GMP has breached and repudiated its obligations imposed by federal law.

36. As the result of GMP's actions, the Plaintiff is unable to obtain financing for its QFs, and thus is not able to construct them. As a result, Plaintiff has suffered, and continues to suffer, damages due to the loss of income and profit that it would have received if GMP had not breached and repudiated its obligations imposed by federal law.

## COUNT II

### IN THE ALTERNATIVE TO COUNT I
### VIOLATION OF THE FEDERAL POWER ACT AND PURPA BY VEPPI

37. Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 36 as though fully set forth herein.

38. If this Court finds that GMP has no obligation under federal law to purchase from Plaintiff's QFs because VEPPI has such obligation, then Plaintiff seeks relief against VEPPI to the same extent that it has sought relief against GMP.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

(1) That this Court find and declare that GMP (or in the alternative VEPPI) has an obligation to purchase all energy and capacity from Plaintiff's QFs at the 15.5-cent level 25-year rate offered for a term of 25 years as specified in Plaintiff's offer, or alternatively at one of the other two options offered by Plaintiff;

(2) That this Court order GMP (or in the alternative VEPPI) to execute the power purchase agreements provided by Plaintiff;

(3) That this Court enjoin GMP (or in the alternative VEPPI) from conduct inconsistent with its obligations under PURPA;

(4) That this Court award damages to Plaintiff in an amount that reflects the income that Plaintiff has lost due to GMP's (or in the alternative VEPPI's) refusal to timely execute the power purchase agreements;

(5) That this Court award Plaintiff its reasonable attorneys' fees; and

(6) That Plaintiff be granted such other further relief as the Court may deem just and proper.

Dated: January 25, 2016

                                            Thomas Melone
                                            ALLCO RENEWABLE ENERGY LIMITED
                                            77 Water St., 8th Floor
                                            New York, NY 10005
                                            Telephone: (212) 681-1120
                                            Facsimile: (801) 858-8818
                                            Thomas.Melone@AllcoUS.com

                                            *Attorney for Plaintiff*